1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

JEFFREY D. DINTZER (S.B. #139056)
jeffrey.dintzer@alston.com
MATTHEW C. WICKERSHAM (S.B. #241733)
matt.wickersham@alston.com
ALSTON & BIRD LLP
333 South Hope Street, 16th Floor
Los Angeles, California  90071
Telephone:     +1 213 576 1000
Facsimile:     +1 213 576 1100

Attorneys for Plaintiffs FIVE POINT HOLDINGS,
LLC and CP DEVELOPMENT CO., LLC

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FIVE POINT HOLDINGS, LLC and CP DEVELOPMENT CO., LLC<br><br>Plaintiffs,<br><br>v.<br><br>TETRA TECH, INC.; TETRA TECH EC, INC; and ROES 1-100 Inclusive,<br><br>Defendants. | Case No. _____<br><br>**COMPLAINT OF FIVE POINT HOLDINGS, LLC AND CP DEVELOPMENT CO., LLC AGAINST DEFENDANTS TETRA TECH, INC., TETRA TECH EC, INC., AND ROES 1–50 FOR:**<br><br>**(1) FRAUDULENT DECEIT**<br><br>**(2) NEGLIGENCE**<br><br>**(3) NEGLIGENT HIRING**<br><br>**(4) NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**<br><br>**(5) INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**<br><br>**(6) EQUITABLE INDEMNIFICATION**<br><br>**JURY TRIAL DEMANDED** |

1

## TABLE OF CONTENTS

2

3   I.    INTRODUCTION ................................................................................................. 1

4   II.   PARTIES ............................................................................................................. 3

5   III.  JURISDICTION AND VENUE .......................................................................... 4

6   IV.   FACTS ................................................................................................................ 5

7         A.    The Hunters Point Naval Shipyard ......................................................... 5

8         B.    Tetra Tech's "Investigation" of The Shipyard ....................................... 7

9         C.    Tetra Tech's Knowledge of the Purpose of the Investigation ................ 9

10        D.    Tetra Tech's Services ............................................................................ 11

11        E.    Tetra Tech's False Statements in Reports ............................................. 12

12        F.    Plaintiffs' Knowledge of Tetra Tech's Fraud ....................................... 15

13        G.    Injuries Suffered by Plaintiffs .............................................................. 16

14  V.    PRINCIPAL/AGENT LIABILITY .................................................................. 17

15  VI.   FIRST CAUSE OF ACTION (FRAUDULENT DECEIT)................................ 19

16  VII.  SECOND CAUSE OF ACTION (NEGLIGENCE) .......................................... 21

17  VIII. THIRD CAUSE OF ACTION (NEGLIGENT HIRING)................................... 23

18  IX.   FOURTH CAUSE OF ACTION (NEGLIGENT INTERFERENCE WITH PROSPECTIVE
    ECONOMIC ADVANTAGE) ........................................................................... 24
19
    X.    FIFTH CAUSE OF ACTION (INTENTIONAL INTERFERENCE WITH PROSPECTIVE
20        ECONOMIC ADVANTAGE) ........................................................................... 25

21  XI.   SIXTH CAUSE OF ACTION (EQUITABLE INDEMNIFICATION) .............. 26

22  XII.  PRAYER FOR RELIEF ................................................................................... 27

23  DEMAND FOR JURY TRIAL.................................................................................. 28

24

25

26

27

28

LEGAL02/38820662v16

## I.   **INTRODUCTION**

1.      In 1991, the United States Department of the Navy, acting as part of the United States of America ("United States") (hereinafter referred to as the "United States", "the Government" or "the Navy"), announced its intention to close the Hunters Point Naval Shipyard (the "Shipyard") and transfer the Shipyard to the City and County of San Francisco ("San Francisco") for redevelopment. The Shipyard, which includes hundreds of acres of prime real estate, offered an opportunity for the development of affordable homes and community benefits in an area of San Francisco short on both.

2.      Plaintiff Five Point Holdings LLC ("Five Point") is an owner and developer of mixed-use, master-planned communities in coastal California. Plaintiff CP Development Co., LLC ("CP Dev. Co.," and collectively with Five Point, as "Plaintiffs") is an indirect subsidiary of Five Point. After the Navy transfers Shipyard properties to San Francisco, San Francisco transfers them to CP Dev. Co., which will develop the properties. At the time Plaintiffs acquired their interest in the redevelopment of the Shipyard, the United States had provided to San Francisco and Plaintiffs a schedule for completion of environmental remediation by the United States' remediation contractors, including Defendants Tetra Tech, Inc. and Tetra Tech EC, Inc. (collectively, "Tetra Tech") and for the subsequent property transfer by the United States to San Francisco; the schedule called for the transfer of the Shipyard properties that would then be transferred to Plaintiffs for redevelopment in phases beginning in 2016, with the bulk of the property to be transferred by 2019, and the final parcel in 2021.

3.      Unfortunately, in May 2018, Plaintiffs learned for the first time from public reports that the United States had filed a victim impact statement with this federal court estimating that the remaining planned transfer of the Shipyard property, including the transfer of parcels to Plaintiffs for redevelopment, would be delayed for a significant period of time. Following the release of that information, the Navy provided Plaintiffs a remediation schedule that calls for a phased transfer to San Francisco beginning in 2022 and ending in 2026 (and now another schedule that calls for transfers to begin in 2021 and end in 2025). The new transfer

FIVE POINT AND CP DEVELOPMENT
COMPLAINT AGAINST TETRA TECH DEFS.

LEGAL02/38820662v16

1   schedule totally contradicted the prior transfer schedule provided by the United States to

2   Plaintiffs.

3        4.     Transfer of the Shipyard property and redevelopment of the Shipyard has been

4   delayed as a result of the recent discovery of the fraud perpetrated by Tetra Tech. Tetra Tech was

5   paid hundreds of millions of dollars by the United States to investigate potential environmental

6   contaminants, which might be present on the Shipyard property due to prior Navy activities and

7   remediate those contaminants. Instead of conducting a proper investigation, testing, and

8   remediation, Tetra Tech engaged in fraud to reduce its costs and maximize profits under its

9   contracts with the United States.

10        5.     At its inception, Tetra Tech actively and systematically concealed its scheme from

11   the Navy, San Francisco, Plaintiffs, and others.[1] Tetra Tech submitted tens of thousands of pages

12   of reports attesting that it had conducted legitimate environmental surveys and investigation,

13   testing, and remediation in the Shipyard. Based on those reports, Tetra Tech attested that

14   radiological remediation of certain areas of the Shipyard—including areas to be redeveloped by

15   Plaintiffs—was complete. Tetra Tech knew those reports were untrue. In some cases, Tetra Tech

16   would attribute clean survey results to other areas of the Shipyard that had not been certified as

17   remediated. In other cases, Tetra Tech destroyed legitimate soil samples, and fraudulently

18   replaced them with samples from areas of the Shipyard that were already known to contain clean

19   soil. Tetra Tech knowingly subverted its remediation obligations to safely clean up the Shipyard

20   property—for which it was paid hundreds of millions of dollars.

21        6.     Fraudulent activities at the site have been confirmed. Two former Tetra Tech

22   employees secretly pled guilty to felonies for their roles in the fraudulent conduct described

23   above. The U.S. Department of Justice has recently intervened in a *qui tam* Complaint brought by

24   insider whistleblowers. The United States is pursuing violations of the False Claims Act against

25

26

---

27   [1] Unless otherwise noted, allegations in this complaint regarding the acts, omissions, mental states, knowledge, and statements of Tetra Tech, Inc., Tetra Tech EC, Inc., New World Environmental Radiological Survey & Remediation Services LLC, and IO Environmental & Infrastructure Incorporated are made on information and belief.

28

2

1  Tetra Tech based upon the widespread fraud in the performance of Tetra Tech's environmental
2  investigation work at the Shipyard under its contract with the United States.

3       7.      The fraudulent conduct by Tetra Tech has received widespread, negative media
4  attention. That negative media attention has diminished the value of future development of the
5  Shipyard, and the value of surrounding properties on which Tetra Tech did little or no work.

6       8.      As a result of this fraudulent conduct at the Shipyard, Plaintiff Five Point and its
7  Chief Executive Officer (Emile Haddad) have been named as defendants in numerous lawsuits
8  against Tetra Tech, even though they had absolutely nothing to do with remediation at the site and
9  did not know the extent of the fraudulent activities of Tetra Tech (or the impact of such activities
10 on the Shipyard transfer schedule) until those activities became public in May 2018. Rather,
11 given the significant delay in the transfer of the Shipyard property to Plaintiffs and the negative
12 public perception now associated with the Shipyard, Plaintiffs are a victim of Tetra Tech's
13 fraudulent and illegal acts. Because of the fraud perpetrated by Tetra Tech, the United States is
14 unable to certify the Shipyard property for transfer to Plaintiffs. As of the filing of this Complaint,
15 the United States has not and cannot give Plaintiffs any realistic assurances as to when the
16 Shipyard property will be transferred due to Tetra Tech's conduct. Tetra Tech should be held
17 liable for the damage it has caused to Plaintiffs.

18                              **II.    PARTIES**

19      9.      Defendant Tetra Tech, Inc. ("TTI") is a Delaware corporation with its headquarters
20 and principal place of business in Pasadena, California. TTI does business in the state of
21 California, including in San Francisco, and was involved in testing and remediating the soil and
22 buildings at the Shipyard pursuant to a contract with the Navy.

23      10.     Defendant Tetra Tech EC, Inc. ("TTEC") is a wholly owned and wholly controlled
24 subsidiary of Tetra Tech Inc., with its headquarters and principal place of business in Morris
25 Plains, New Jersey. TTEC does business in the state of California, including in San Francisco,
26 and was involved in testing and remediating the soil and buildings at the Shipyard pursuant to a
27 contract with the Navy.

28

FIVE POINT AND CP DEVELOPMENT
COMPLAINT AGAINST TETRA TECH DEFS.

LEGAL02/38820662v16

11.     Plaintiffs are ignorant of the true names and capacities of Defendants sued as Roes 1 through 50, inclusive, and therefore sues these defendants by such fictitious names. Plaintiffs will amend this Complaint to allege the true names and capacities of these defendants when ascertained. Each of the fictitiously named defendants is, or will be, responsible for the occurrences alleged in this Complaint and for Plaintiffs' injuries, both existing and prospective. Each Roe defendant legally and proximately caused damage to Plaintiffs. Each and every Roe defendant had a duty to Plaintiffs to use reasonable care in performing the tasks related to testing and remediation of the Shipyard.

12.     Plaintiffs Five Point and CP Dev. Co. are limited liability companies both formed in the state of Delaware and both registered as a foreign limited liability companies with the State of California. Five Point conducts its business as the operating managing member of Five Point Operating Company, LP, a Delaware limited partnership. Five Point Operating Company, LP is the sole manager of The Shipyard Communities, LLC, a Delaware limited liability company. The Shipyard Communities, LLC is the parent company of CP Dev. Co. CP Dev. Co. is the entity that will own and develop the Shipyard property ultimately transferred to Plaintiffs. Plaintiff Five Point has an interest in redevelopment upon transfer from the United States by managing operations of CP Dev. Co. Plaintiffs have been harmed by Tetra Tech.

### III.     JURISDICTION AND VENUE

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1441(a), on the ground that the conduct giving rise to this action occurred in part on a federal enclave within the former Hunters Point Naval Shipyard.

14.     Venue is proper in the Northern District of California under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in this district and the property that is the subject of the action is situated in this District.

15.     On March 7, 2019, Plaintiffs and Tetra Tech (as well as the Lennar Corporation) entered into an agreement tolling any and all statutes of limitations, statutes of repose, or any other law or principle with similar effect to claims by Plaintiffs against Tetra Tech. During the tolling period, the parties agreed to not assert any claims against any other party related to the

FIVE POINT AND CP DEVELOPMENT
COMPLAINT AGAINST TETRA TECH DEFS.

Shipyard. Pursuant to section 3 of the agreement, Plaintiffs sent a notice to terminate the agreement to the other parties on February 14, 2020, which terminated the agreement effective 10 days thereafter, *i.e.*, February 24, 2020.

## IV.   FACTS

### A.   The Hunters Point Naval Shipyard

16.   The Shipyard is located on a promontory in southeastern San Francisco, and consists of approximately 936 acres, a portion of which is submerged beneath the San Francisco Bay.

17.   The United States purchased the Shipyard property in 1939 and used the site as a center for ship repair during World War II and the Korean War. Due to Naval activities at and around the site, areas of the Shipyard risked contamination by radionuclides. The United States deactivated the Shipyard in 1974 and most of the site was leased to a commercial ship repair company from 1976 to 1986. In 1991, the Shipyard was selected for closure pursuant to the terms of the Defense Base Closure and Realignment Act of 1990, Part A of Title XXIX of Public Law 101-510, 10 U.S.C. § 2687.

18.   On January 21, 1994, the United States, San Francisco, and the City and County of San Francisco Redevelopment Agency ("SFRA") executed a memorandum of understanding to establish the process for conveying the Shipyard property for redevelopment. Pursuant to a Conveyance Agreement between the United States on the one hand, and the SFRA on the other, the Shipyard was to be transferred to the SFRA in multiple phases. The United States had previously delineated the Shipyard into separate parcels. The first phase of transfer included Parcel A, while the second phase of transfer was meant to include the remaining parcels.

19.   Before the United States may transfer Shipyard property for redevelopment, the Navy must certify that the property scheduled to be transferred has been subject to environmental investigation and that the results of the investigation determine the property is suitable for transfer. The Navy does so by issuing a Finding of Suitability to Transfer ("FOST") for that specific portion of the Shipyard that is subject to transfer. Without a FOST, Shipyard property may not be transferred.

FIVE POINT AND CP DEVELOPMENT
COMPLAINT AGAINST TETRA TECH DEFS.

LEGAL02/38820662v16

20.     In 2004, the Navy issued a FOST for Parcel A, and transferred Parcel A to the SRFRA for redevelopment. In 2005, the SFRA conveyed the majority of Parcel A to affiliates of Lennar Corporation, which broke ground on redevelopment of Parcel A in June 2013. Since transferring Parcel A in 2005, the SFRA was dissolved pursuant to California state law, and the City subsequently created the Office of Community Investment and Infrastructure as the Successor Agency to the SFRA, which is required to complete work related to prior enforceable obligations of the SFRA such as the Conveyance Agreement.

21.     In May 2007, affiliates of the Lennar Corporation and the SFRA executed the Second Amended and Restated Exclusive Negotiations and Planning Agreement (Phase 2 of Hunters Point Shipyard, with an Option to Expand Planning and Exclusive Negotiations to Include Candlestick Point) ("ENA") concerning development of Phase 2 of the Shipyard for parcels other than Parcel A. In August 2008, Lennar affiliates assigned their interests in the ENA to CP Dev. Co. In June 2010, CP Dev. Co. and the SFRA entered into the Disposition and Development Agreement (Candlestick Point and Phase 2 of the Hunters Point Shipyard) ("DDA"), which provided for the development of Phase 2 of the Shipyard by CP Dev. Co. In May 2013, the interests of CP Dev. Co. under the DDA in development of Phase 2 of the Shipyard were assigned by affiliates of the Lennar Corporation to The Shipyard Communities, LLC ("TSC"). In September 2015, CP Dev. Co. was added as a "Tenant" to the Interim Lease with the SFRA, whereby CP Dev. Co. leases property at the Shipyard owned by the SFRA related to Phase 2 of the Shipyard development.

22.     In May 2016, Five Point Operating Company, LP acquired TSC as a subsidiary, with TSC retaining the development interests of CP Dev. Co. in development of Phase 2 of the Shipyard. As the operating managing member of Five Point Operating Company, LP, Plaintiff Five Point acquired development interests in the Shipyard as well. Consequently, in May 2016, Plaintiffs acquired exclusive interests to conveyance, management, and redevelopment of the remaining parcels of the Shipyard (other than Parcel A) from affiliates of Lennar Corporation. The Navy has issued a FOST for Parcels D-2, UC-1, and UC-2, though those Parcels have not been transferred to Plaintiffs for redevelopment. Those parcels have been leased from the City to

FIVE POINT AND CP DEVELOPMENT COMPLAINT AGAINST TETRA TECH DEFS.

LEGAL02/38820662v16

CP Dev. Co. under the Interim Lease. CP Dev. Co. then started horizontal (*i.e.*, utilities) development on those parcels but was later forced to halt development when Tetra Tech's fraud came to light.  The Navy has not yet issued a FOST for any of the Shipyard's remaining parcels that are to be transferred to Plaintiffs.

**B.      Tetra Tech's "Investigation" of The Shipyard**

23.      From 2003 to 2014, Tetra Tech entered into approximately fifteen different contracts with the Navy to perform services related to investigation, testing, and remediation of property at the Shipyard.

24.      On February 16, 2005, Tetra Tech submitted a Radiological Work Plan under Navy Contract No. N6871198-D-5713. That plan described "survey and decontamination approaches that will be implemented in support of radiological release of buildings and areas" at the Shipyard. Tetra Tech explained that the "objectives of these release activities are to evaluate impacted sites that may contain residual radioactive contamination as a result of past activities at [the Shipyard], cleanup radioactive contamination that is identified, and confirm that buildings and sites at [the Shipyard] meet the release criteria." Tetra Tech identified specific "release criteria," which describe the maximum permissible levels of radioactivity for soils and surfaces within the Shipyard. In order for each parcel of the Shipyard to be released by the Navy for redevelopment, Tetra Tech was required to conduct tests of soils and surfaces to ensure that any remaining radiological contamination was below the levels specified in the release criteria.

25.      Instead of conducting the testing and remediation as agreed to, Tetra Tech fraudulently conducted that resting and remediation. Among other activities, Tetra Tech oversaw, directed and concealed the falsification of a large number of soil samples. In some cases, samples were collected from "clean" soil and placed into containers which had chain of custody labels indicating that soil had been collected from areas that Tetra Tech had not yet sufficiently remediated. Tera Tech then represented to the Navy that the clean soil had come from areas where remediation had taken place; thus, Tetra Tech falsely identified as "clean" areas where potentially contaminated soil existed. This was done so Tetra Tech could avoid having legitimate

FIVE POINT AND CP DEVELOPMENT
COMPLAINT AGAINST TETRA TECH DEFS.

LEGAL02/38820662v16

1   samples analyzed by the certified laboratories, in order to speed up the Shipyard investigation

2   process and increase Tetra Tech's profits.

3       26.     In May 2017, following a confidential investigation by the U.S. Department of

4   Justice ("DOJ"), Stephen Rolfe and Justin Hubbard—two of Tetra Tech's Radiation Control

5   Technician ("RTC") Supervisors who oversaw radiological investigation, testing, and remediation

6   at the Shipyard—secretly pled guilty to "destruction, alteration, or falsification of records in

7   federal investigations" in violation of 18 U.S.C. Section 1519. Rolfe and Hubbard admitted that

8   they falsified their investigation of the Shipyard by substituting clean soil in place of legitimate

9   samples from the areas designated for testing. Rolfe specifically admitted that he had instructed

10   his subordinates to substitute clean soil for legitimate samples on approximately twenty occasions

11   in 2012.

12       27.     The cases against Hubbard and Rolfe were sealed by the federal court until

13   sentencing proceedings against Hubbard on or around May 2, 2018. Until that time, Plaintiffs

14   were not aware of the admissions and guilty pleas by employees of Tetra Tech or the significant

15   fraud that had occurred. Despite the ongoing investigation by the DOJ, the United States never

16   communicated to Plaintiffs the extent of the fraud by Tetra Tech that had taken place or how long

17   the transfer of Shipyard property would be delayed. Plaintiffs did not learn such information until

18   May 2018. Through reasonable diligence, Plaintiffs could not have discovered the extent of Tetra

19   Tech's fraud or the impact such fraud would have on the transfer schedule because the scope of

20   the fraud had been hidden by Tetra Tech and the United States.

21       28.     Additionally, Plaintiffs learned that Tetra Tech fabricated radiological surveys of

22   buildings in the Shipyard. After a building was scanned (whether properly or improperly), the

23   data collected from the scans were often changed to reduce the detected levels. Tetra Tech

24   management favored the data manipulation because it would allow Tetra Tech to receive payment

25   from the United States sooner than producing accurate data, and providing adequate investigation,

26   testing, and remediation.

27       29.     Former employees have now testified that Tetra Tech set up Radiological

28   Screening Yards ("RSY") in the Shipyard, including a series of pads where soil was spread out to

FIVE POINT AND CP DEVELOPMENT
COMPLAINT AGAINST TETRA TECH DEFS.

be scanned for radiological contamination. Tetra Tech intentionally and improperly scanned soil on the RSY pads to ensure that the scans did not identify radiological contamination.

30.     Tetra Tech also hired unqualified workers to aid in remediation efforts. Tetra Tech placed unqualified employees in positions of considerable responsibility, including overseeing radiological sampling and testing at the Shipyard. As a result, soil samples were collected and tested improperly. Tetra Tech was willing to hire unqualified individuals in order to streamline investigation efforts and save money. Tetra Tech also fired employees who threatened to reveal Tetra Tech's improper conduct.

31.     Tetra Tech concealed, and continues to attempt to conceal, its improper conduct from Plaintiffs and other stakeholders. In numerous detailed reports to the United States, court filings, and press statements, Tetra Tech represented, and continues to represent, that it properly conducted environmental investigation, testing, and remediation at the Shipyard, when it knew— and knows to this day—that to be untrue. For example, prior to and through at least 2014, multiple former Tetra Tech employees and contractors raised various allegations to the United States and the Nuclear Regulatory Commission that Tetra Tech had engaged in fraudulent investigative practices. Tetra Tech intentionally failed to admit to the full scale of its fraudulent activities at the Shipyard. At that time, the United States accepted Tetra Tech's explanation for Tetra Tech's fraudulent investigative practices, and thereby allowed Tetra Tech to continue its work at the Shipyard. The United States did not inform Plaintiffs that Tetra Tech had committed extensive fraud during Tetra Tech's work at the Shipyard. The United States did not inform Plaintiffs that the transfer schedule would be substantially delayed as a result of the fraud. Plaintiffs did not learn of the possibility that the transfer schedule would be delayed until on or around May 2, 2018, when the indictments against Hubbard and Rolfe were unsealed by the federal court.

**C.     Tetra Tech's Knowledge of the Purpose of the Investigation**

32.     Tetra Tech knew that its environmental investigation, testing and remediation of the Shipyard was for the specific purpose of preparing the Shipyard for redevelopment by developers such as Plaintiffs into residential and commercial property. Indeed, as part of its

FIVE POINT AND CP DEVELOPMENT
COMPLAINT AGAINST TETRA TECH DEFS.

obligations, Tetra Tech was ultimately required to prepare a FOST for approval and issuance by the Navy to certify that a given parcel is suitable for transfer for redevelopment.

33. On October 14, 2004, Tetra Tech prepared for the Navy a FOST for Parcel A. In the Parcel A FOST, Tetra Tech wrote that "[t]he basewide [Environmental Baseline Survey] divided [the Shipyard] into units to correspond to the sub parcels SFRA proposed *in the [Shipyard] redevelopment plan*" (emphasis added). The document explicitly recognizes that "structures at Parcel A [] will be demolished and *redeveloped as residential property* after transfer . . . ." (emphasis added). Tetra Tech also wrote that previous excavation and remediation activities at the Shipyard "were found to meet the cleanup goals *for residential reuse*" (emphasis added).

34. Tetra Tech also prepared a "Final Amended Parcel B Record of Decision" dated January 14, 2009 ("Parcel B ROD") for the Navy to "address remaining contamination at Parcel B" at the Shipyard by proposing "remedial action" to "protect the public health, welfare, and the environment from actual or potential releases of contaminants from the site." In the Parcel B ROD, Tetra Tech explicitly considered "[c]urrent and reasonably anticipated future land-use assumptions" and noted such reuses were "described by [SFRA] in the 1997 Hunters Point Shipyard Redevelopment Plan." Tetra Tech acknowledged that the City's plan included zoning Parcel B for "mixed uses" and "research and development areas," which could include "single-family homes, upper-story housing, or live/work arrangements, and a variety of commercial enterprises, artist studios, retail, and business services on the ground floor."

35. The redevelopment plan Tetra Tech relied upon was published on July 14, 1997 by the SFRA. The SFRA redevelopment plan indicated that many areas within the Shipyard were intended to be redeveloped for residential use.

36. Tetra Tech also prepared a "Third Five-Year Review of Remedial Actions," dated November 8, 2013. This document summarized remedial actions being taken at the Shipyard, which were driven in part by "future land uses" identified by the SFRA. Tetra Tech specifically identified that future uses included "residential; institutional; retail sales and services; office and industrial; multi-media and digital arts; athletic and recreational facilities; civic, arts, and

FIVE POINT AND CP DEVELOPMENT
COMPLAINT AGAINST TETRA TECH DEFS.

entertainment; parks and recreation and other open spaces uses . . . ." Regardless of the future use, as noted above, Tetra Tech's contract with the Navy outlined specific safety levels and minimum requirements for the investigation, testing, and remediation of the property pursuant to the Radiological Work Plan and other materials submitted under Navy Contract No. N6871198-D-5713. Tetra Tech personnel knew that the investigation, testing, and remediation ultimately were for preparing the property for development. Steve Hall, a Senior Project Manager at Tetra Tech was identified on the distribution list for the March 2012 "Final Supplemental Environmental Impact Statement For The Disposal And Reuse Of Hunters Point Shipyard" ("SEIS"). The SEIS explained that the Navy would be preparing the Shipyard for transfer to the City for redevelopment, including residential uses:

> "In 1997, the Board of Supervisors adopted, by Ordinance 285-97, the HPS Redevelopment Plan, which included a mix of **residential**, commercial, research and development, industrial, and parks and open space land uses (SFRA 1997). Along with the HPS Redevelopment Plan, the San Francisco Planning and SFRA Commissions approved the Design for Development (SFRA 1997a). Together, these two documents identified the project goals and objectives, land use designations, development standards, community services and benefits, affordable housing and business relocation requirements, development approval process and development financing opportunities for HPS. These documents were intended to guide redevelopment of HPS.
>
> Based on the 1997 HPS Redevelopment Plan, the DoN initiated the NEPA process and prepared the 2000 FEIS. The 2000 FEIS evaluated the environmental consequences resulting from the implementation of the 1997 HPS Redevelopment Plan. The DoN issued a ROD on 29 November 2000 indicating that **disposal of HPS would be accomplished in a manner as set out in the 1997 HPS Redevelopment Plan**."

(Emphases added).

37.     Tetra Tech knew, or should have known, that as of May 2016, Plaintiffs had acquired an exclusive interest as the master developer of the Shipyard (other than Parcel A, of which affiliates of the Lennar Corporation remain the master developer). Media published in May 2016 identify Plaintiffs as the master developer of the Shipyard.

**D.     Tetra Tech's Services**

38.     Tetra Tech holds itself out to the public as offering skilled and effective radiological remediation services. Its website states that "Tetra Tech performs a full range of services required to remediate . . . radioactive waste sites, and low-level radioactive waste sites.

11     FIVE POINT AND CP DEVELOPMENT COMPLAINT AGAINST TETRA TECH DEFS.

LEGAL02/38820662v16

1    Our completed assignments have ranged from small and simple single objective projects to large,

2    complex multitask and multisite projects. These have included initial site surveys, site

3    investigations, risk assessments, feasibility studies, remedial design and engineering, remedial

4    construction, site closure, and site restoration."

5         39.    Tetra Tech's website further states: "Tetra Tech offers major remediation program

6    management expertise. Our approach melds the technical excellence of our scientists and

7    engineers with proven project management capabilities and systems that consider and combine

8    our clients' responsibilities and budgets. Tetra Tech is also a world leader in applying state-of-the-

9    art in situ and ex situ remedial technology, including conventional and innovative technologies

10   for both domestic and international applications."

11        40.    Similarly, around 2002 and later, Tetra Tech's website stated: "***We provide***

12   ***complete engineering and consulting services for hazardous waste remediation projects***, from

13   initial site assessment through design and implementation of remedial solutions. We perform risk

14   assessments to determine the probability of adverse health effects from exposure to toxic

15   substances. We provide waste minimization and pollution prevention services. We evaluate the

16   effectiveness of innovative technologies for environmental problems. We provide operations and

17   maintenance services including: Wastewater treatment plant operation[;] Solid/hazardous waste

18   program management[;] Air monitoring and source reduction" (emphasis added).

19        41.    The website also stated: "Tetra Tech, Inc. is a ***leading provider*** of consulting,

20   engineering and technical services. With more than 7,000 associates located in the United States

21   and internationally, the Company supports commercial and government customers in the areas of

22   resource management and infrastructure. Tetra Tech's services include research and development,

23   ***applied science and technology, engineering design, construction management, and operations***

24   ***and maintenance***" (emphases added).

25   **E.    Tetra Tech's False Statements in Reports**

26        42.    Each time Tetra Tech purportedly completed radiological survey or remediation of

27   work in a building or area (such as a segment of the sanitary sewer and storm drain systems), the

28   Unites States directed it to prepare a final radiological report for that building or area, called a

12                                    FIVE POINT AND CP DEVELOPMENT
                                      COMPLAINT AGAINST TETRA TECH DEFS.

final status survey report for buildings and a final survey unit project report for a sewer and storm drain segment. After all of the final reports were issued for a Shipyard transfer parcel, the United States directed Tetra Tech to prepare a Radiological Removal Action Completion Report ("Rad-RACR") for that parcel. The purpose of the Rad-RACRs was to "summarize the results of the radiological work activities performed for" each portion of the Shipyard, including affirming that radiological remediation was complete and that any remaining "residual radioactivity levels . . . meet the established release criteria." Tetra Tech knew or should have known that completed and signed Rad-RACRs were necessary before a FOST could be issued for a parcel, allowing it to be transferred by the United States to San Francisco for redevelopment.

43.     Tetra Tech prepared at least four Rad-RACRs for parcels intended to be conveyed to San Francisco and then to Plaintiffs upon completion of all necessary remediation. The first two were dated March 2, 2011, and related to Parcels UC1 and UC2 as well as Parcel G. The third was dated December 16, 2011, and related to Parcel D-2. The fourth was dated March 2, 2012, and related to Parcel B. Parcels UC1, UC2, D-2, and B are all subject to conveyance to Plaintiffs by San Francisco upon certification of remediation by the Navy. In addition to these Rad-RACRs, Tetra Tech also prepared final radiological reports for at least 50 buildings or areas in other transfer parcels which do not yet have Rad-RACRs, but which are also intended to be conveyed to San Francisco and then Plaintiffs upon certification of remediation by the Navy.

44.     Unbeknownst to Plaintiffs, Tetra Tech knew, and purposefully concealed the fact that it had not complied with applicable statutes and regulations concerning environmental investigation, testing, and remediation of the Shipyard in preparing the final radiological reports and Rad-RACRs. Tetra Tech knew that these factual representations were false at the time they were made because they were based upon data that was fraudulently collected and analyzed by Tetra Tech. The extent of this fraud is summarized in Final Fourth Five-Year Review for Hunters Point Naval Shipyard (July 2019), which was not prepared by Tetra Tech but by another environmental contractor, Innovex ERRG. That report states that "the Navy determined that a significant portion of the radiological survey and remediation work completed to date was not reliable because of manipulation and/or falsification of data by one of its radiological remediation

FIVE POINT AND CP DEVELOPMENT
COMPLAINT AGAINST TETRA TECH DEFS.

contractors. <u>Radiological data identified in reports associated with Parcels B-1, B-2, C, D-2, E, G, UC-1, UC-2, and UC-3 were deemed unreliable</u>." In its September 27, 2019 concurrence letter for this review, the United States concluded that "there was no current health risks on the site, based on current site conditions and current uses," but that all of these parcels would "require further actions to remain protective in the long-term." This includes Parcels D-2, UC-1 and UC-2, which have received FOSTs and been transferred to San Francisco, and after which Plaintiffs began to conduct critical preliminary development activities as San Francisco's lessee.

45.    Tetra Tech's purported completion of the final radiological reports and Rad-RACRs was a crucial component of the schedule set by the United States for transfer of the parcels scheduled for future redevelopment of the Shipyard. Plaintiffs relied on the fact that Rad-RACRs and FOSTs for Parcels D-2, UC-1 and UC-2—where Plaintiffs planned to conduct critical preliminary development activities as San Francisco's lessee—had been issued and the property transferred to San Francisco in September 2015, which occurred prior to Plaintiffs' acquisition of Shipyard development rights in May 2016. Moreover, Plaintiffs relied on the fact that the Rad-RACRs for the first set of parcels it intended to own and develop (Parcels B and G) had already been completed and accepted by the United States prior to Plaintiffs' acquisition of their Phase 2 development rights in May 2016. The fact that these milestones had purportedly been achieved demonstrated to Plaintiffs that the United States trusted Tetra Tech to complete remediation in accordance with the published schedule and that substantial work had already been completed. In that way, Plaintiffs relied on the radiological reports and Rad-RACRs prepared by Tetra Tech when Plaintiffs invested in and went forward with planning and redevelopment of the Shipyard. At no time did Tetra Tech disclose to Plaintiffs that these statements, conclusions, and representations from the radiological reports and Rad-RACRs were false or based upon fraudulent investigation practices.

46.    Plaintiffs acquired their stake in redevelopment of the Shipyard in reliance on the fact that substantial portions of Tetra Tech's radiological work and other remediation had purportedly been completed in a timely manner, making it reasonable to rely on the schedule

FIVE POINT AND CP DEVELOPMENT
COMPLAINT AGAINST TETRA TECH DEFS.

1    provided by the United States, which was itself based on that work being completed by Tetra

2    Tech in a timely manner pursuant to the requirements provided by the Navy.

3    **F.**    **Plaintiffs' Knowledge of Tetra Tech's Fraud**

4         47.    Plaintiffs' cause of action against Tetra Tech did not accrue until after the

5    indictments against Hubbard and Rolfe were unsealed by the federal court as part of the

6    sentencing proceedings against Hubbard on or around May 2, 2018. Until that time, Plaintiffs

7    were not aware of the scope of the fraud committed by Tetra Tech. Further, Plaintiffs were not

8    aware that the transfer schedule previously proposed by the United States would be significantly

9    delayed by Tetra Tech's actions until on or around May 2, 2018. As part of the indictment

10   proceedings, the United States disclosed for the first time that the transfer schedule would be

11   delayed up to a decade based on Tetra Tech's conduct. Up until this time, Plaintiffs were unaware

12   that the transfer schedule would change such that they would suffer significant financial injuries.

13        48.    Prior to and through at least 2014, multiple former Tetra Tech employees and

14   contractors raised various allegations to the Navy and the Nuclear Regulatory Commission that

15   Tetra Tech had engaged in fraudulent investigative practices. In 2014, Tetra Tech admitted that

16   certain employees had provided false soil samples to the United States, but claimed the fraud was

17   limited to those few former employees and a small number of samples, and required remaining

18   employees to engage in "ethics training." Tetra Tech intentionally failed to admit to the full scale

19   of its fraudulent activities at the Shipyard that has caused the damages that Plaintiffs has and will

20   suffer as their development project is delayed.

21        49.    At that time, the United States accepted Tetra Tech's explanation for Tetra Tech's

22   fraudulent investigative practices, and thereby allowed Tetra Tech to continue its work at the

23   Shipyard. The United States did not inform Plaintiffs that Tetra Tech had committed extensive

24   fraud during Tetra Tech's work at the Shipyard. The United States did not inform Plaintiffs that

25   the transfer schedule would be substantially delayed as a result of the fraud. Plaintiffs did not

26   learn of the possibility that the transfer schedule would be substantially delayed because of the

27   fraud until on or around May 2, 2018, when the indictments against Hubbard and Rolfe were

28   unsealed by the federal court. By that time, Plaintiffs had already started to build out portions of

15

FIVE POINT AND CP DEVELOPMENT
COMPLAINT AGAINST TETRA TECH DEFS.

the Shipyard property leased to Plaintiffs from the City, including a community kitchen and artist colony. In fact, Plaintiffs who had started the horizontal development of the artist colony were forced to abandon the physical development of that facility in the summer of 2018, after the wide spread nature of the fraud became public.

50.     When allegations of fraud against Tetra Tech were made to the United States and the Nuclear Regulatory Commission in 2014, Tetra Tech deliberately misled the United States and other regulators about the widespread and systemic nature of its fraudulent activities at the Shipyard. Despite knowledge otherwise in 2014, Tetra Tech failed to admit to the full scale of its fraudulent activities at the Shipyard. Tetra Tech deliberately concealed its fraudulent activities from the United States and other regulators.

51.     In April 2018, the Chief Executive Officer of Tetra Tech, Dan Batrack, issued a letter to the Navy that disputed the "false and misleading allegations" concerning Tetra Tech's work at the Shipyard. In that letter, the Tetra Tech CEO acknowledged the damage such claims could do to "property owners" of the Shipyard. The Tetra Tech CEO asserted that "at all times, our work was monitored and overseen by the Navy to ensure it met contractual and safety standards." Tetra Tech then offered to "immediately re-test all areas in question" at the Shipyard, which it expected to be "completed within a one- to two-month period."

52.     As of May 2018, the United States continued to publicly represent that the bulk of the Shipyard property would be transferred to Plaintiffs for redevelopment in 2019, when it held a public workshop that included a presentation depicting that schedule. But when the victim impact statements from the United States in the Rolfe and Hubbard cases were also revealed in May 2018, the United States finally admitted under oath that Tetra Tech's fraud would cause substantial schedule delays.

**G.     Injuries Suffered by Plaintiffs**

53.     The fraud perpetrated by Tetra Tech concerning investigation, testing, and remediation of environmental contamination at the Shipyard has injured Plaintiffs. Before Plaintiffs can begin redevelopment on any of the remaining parcels of the Shipyard, the Navy must issue a FOST, which it cannot do until an exhaustive, time consuming re-evaluation of Tetra

FIVE POINT AND CP DEVELOPMENT
COMPLAINT AGAINST TETRA TECH DEFS.

Tech's radiological work is conducted at all of the remaining parcels to be transferred. This re-evaluation is expected to take several years.

54.     When Plaintiffs acquired their interest in redevelopment of the Shipyard in May 2016, the bulk of the property was scheduled to be transferred by 2019, and the final parcel in 2021. But now, the transfer of Shipyard properties to Plaintiffs cannot occur as scheduled; the investigation, testing, and remediation conducted by Tetra Tech must be reviewed and reexamined in detail. According to statements from the United States made public in May 2018, Tetra Tech's fraudulent actions will delay any transfer for a significant period of time. The most recent schedule distributed by the United States shows the final parcel transferring in late 2025.

55.     This delay will result in substantial economic and reputational harm to Plaintiffs, which cannot generate any revenue from their investment in redeveloping the Shipyard until after the Shipyard property is properly investigated and remediated, and thereafter transferred to Plaintiffs. Like any development company, Plaintiffs can only realize meaningful profits from their redevelopment projects when those projects are completed on time. That is especially so when plans must be made decades in advance, such as the massive mixed-use redevelopment of the Shipyard property that is contingent upon environmental investigation and remediation. In its transfer schedule, the United States represented the timing that radiological remediation work would be completed on Parcel B (which is now being re-evaluated), which provided an important basis for Plaintiffs' determination that the transfer schedule would be met. Plaintiffs have also incurred substantial costs in responding to the harm caused by Tetra Tech, including costs associated with a host of lawsuits brought against Plaintiff Five Point arising out of the fraud perpetrated by Tetra Tech. The fraud perpetrated by Tetra Tech has also significantly diminished the value of the Shipyard property to be redeveloped by Plaintiffs, as well as surrounding properties, which are also to be developed by Plaintiffs.

## V.     PRINCIPAL/AGENT LIABILITY

56.     Tetra Tech is liable for the acts of their employees, subcontractors, and other agents involved in fabricating the radiological investigation, testing, and remediation of the Shipyard, including at least Tetra Tech VP Andrew Bolt, Tetra Tech General Manager William

LEGAL02/38820662v16

Dougherty, Tetra Tech Construction Superintendent Dennis McWade, Tetra Tech RCT Supervisors Stephen Rolfe and Justin Hubbard, Tetra Tech Senior RCT Jane Taylor, subcontractor Radiological Survey & Remediation Services, LLC ("RSRS"), RSRS Vice Presidents Brian Henderson and Daryl DeLong, subcontractor IO Environmental & Infrastructure Incorporated ("IOEI"), and the employees of RSRS and IOEI.

57.    Tetra Tech went to extraordinary lengths to coerce or induce subcontractors and/or employees, including the individuals and entities identified above, to engage in wrongful conduct. Tetra Tech management pressured, threatened to fire and/or did fire employees that would not aid in fabricating the investigation. The risk of Tetra Tech employees engaging in the wrongful acts described herein is inherent to, and is a foreseeable consequence of, the enterprise of Tetra Tech.

58.    The described acts and failures to act described herein in furtherance of fabricating the investigation, testing, and remediation of the Shipyard that were made by agents and employees of Tetra Tech were undertaken pursuant to the direction and control, and/or with the permission, consent, and authorization of Tetra Tech.

59.    The Tetra Tech employees, subcontractors, and other agents that executed the fraudulent investigation described herein were acting within the scope of their employment and/or contractual obligations with Tetra Tech. Activities described herein, such as collecting soil samples and conducting building surveys, were primary functions of their employment and/or contractual obligations. Activities described herein were taken for the benefit of Tetra Tech.

60.    Tetra Tech ratified the acts of its agents and employees by continuing to employ them and instructing them to repeat the same wrongful conduct.

61.    TTI is liable for the acts of its wholly owned subsidiary, TTEC. TTI has admitted that the acts of TTEC should be attributed to TTI due to their close relationship. For example, in relation to one particular government contract, TTI argued that "[TTI's] and [TTEC's] routine business practices generally, and their respective particular actions in connection with the subject Project were at all material times taken on behalf and at the direction of the other in their roles as parent and wholly-owned subsidiary, and as business units of the same company."

62.     Numerous other factors also support liability of TTI for the acts of TTEC. First, some individuals who serve as officers of TTI also serve as officers of TTEC. Second, TTEC and TTI routinely act closely and in concert to carry out business operations. TTEC has conducted business as a business unit of TTI and has been a vehicle for TTI to enter into contracts with the U.S. Government. TTI exercises full management and control over TTEC. Occasionally, TTEC and TTI enter into subcontracts on behalf of one another regardless of which entity had formal contractual privity with the Government. Third, some or all revenues received by TTEC are attributed to TTI, and some or all obligations of TTEC are discharged by TTI.

63.     TTEC and TTI personnel were jointly involved in managing, controlling, and directing the fraudulent investigation, testing, and remediation of potential environmental contamination at the Shipyard. Tetra Tech is liable for the acts of its subcontractors and agents RSRS and IOEI and their employees.

64.     RSRS and IOEI are liable for the acts of their employees and other agents involved in fabricating the environmental investigation, testing, and remediation at the Shipyard, including, but not limited to, RSRS Vice Presidents Brian Henderson and Daryl DeLong, and RSRS RCT Andrew Smith.

65.     The RSRS and IOEI employees and other agents that executed the fraudulent environmental investigation described herein were acting within the scope of their employment and/or contractual obligations. Activities described herein, such as collecting soil samples and conducting building surveys, were primary functions of their employment and/or contractual obligations.

66.     RSRS and IOEI ratified the acts of their agents and employees by continuing to employ them and instructing them to commit the same wrongful conduct repeatedly over the course of multiple years.

## VI.     FIRST CAUSE OF ACTION
## (FRAUDULENT DECEIT)

67.     Plaintiffs re-allege and incorporate by reference Paragraphs 1 through 66 above as if fully set forth herein.

LEGAL02/38820662v16

68.     In the final radiological reports and Rad-RACRs, Tetra Tech intentionally misrepresented critical facts, which it knew to be false, about its investigation of the Shipyard. Tetra Tech repeatedly and knowingly misrepresented that it had conducted proper radiological surveys and sampling throughout the Shipyard, such that areas of the Shipyard could be confirmed as free of radiological contamination above safe release levels. Tetra Tech knew these misrepresentations were false when made.

69.     Plaintiffs relied on Tetra Tech's intentional misrepresentations at the time they were made, including for acquisition of its interest in redevelopment of the Shipyard, and continued to rely upon them until May 2018, when Plaintiffs learned from public reports the extent of the fraud perpetrated by Tetra Tech. Plaintiffs relied upon Tetra Tech's intentional misrepresentations when Plaintiffs acquired exclusive interests to conveyance, management, and redevelopment of the second phase of Shipyard property (those portions of the Shipyard other than Parcel A) from affiliates of Lennar Corporation in May 2016 at a cost to Plaintiffs of over $1 billion.

70.     Tetra Tech knew that Plaintiffs were relying on Tetra Tech's misrepresentations when Plaintiffs acquired their interest in redevelopment of the Shipyard.

71.     Tetra Tech knew and intended that Plaintiffs would rely on Tetra Tech's misrepresentations. Tetra Tech: (a) held itself out to the public as a reliable environmental radiological investigation company; (b) knew that its investigative work was for the purpose of preparing the Shipyard for Plaintiffs' redevelopment work; and (c) knew that the Rad-RACRs were being distributed by the United States to Plaintiffs for the purpose of planning redevelopment.

72.     Tetra Tech knew that public discovery of Tetra Tech's misrepresentations would delay development at the Shipyard, increase construction and other costs, negatively impact Plaintiffs, and significantly disrupt the overall development.

73.     As a direct and proximate result of Tetra Tech's fraudulent deceit, Plaintiffs have suffered and will continue to suffer damages in an amount to be proven at trial.  Plaintiffs also

FIVE POINT AND CP DEVELOPMENT
COMPLAINT AGAINST TETRA TECH DEFS.

seek punitive and exemplary damages against Tetra Tech for its deliberate malfeasance and outrageous conduct as specifically set forth above.

## VII.  SECOND CAUSE OF ACTION
### (NEGLIGENCE)

74.     Plaintiffs re-allege and incorporate by reference Paragraphs 1 through 73 above as if fully set forth herein.

75.     Tetra Tech owed a duty to Plaintiffs to exercise reasonable and ordinary care to avoid causing economic and other injury to Plaintiffs. That duty arises from the nature of the environmental investigation, testing, and remediation work Tetra Tech was performing, which Tetra Tech repeatedly acknowledged was to ensure Shipyard parcels were suitable for transfer to Plaintiffs for residential and commercial redevelopment.

76.     Tetra Tech's environmental investigation, testing, and remediation of the Shipyard was intended to, and did, affect Plaintiffs. Tetra Tech was aware that its radiological investigation and remediation was conducted for the express purpose of preparing the Shipyard for redevelopment. Tetra Tech was aware that Plaintiffs are a master developer who would be conducting redevelopment of certain parcels of the Shipyard that have yet to be transferred.

77.     Accordingly, it was foreseeable that Tetra Tech's misconduct would significantly delay and/or hinder redevelopment of the Shipyard, discourage property buyers, lessees and lenders, and harm Plaintiffs.

78.     Tetra Tech negligently, carelessly, tortiously, and wrongfully breached its duty to Plaintiffs through misconduct that included, but is not limited to, falsifying soil samples and building surveys, destroying and falsifying records, and failing to supervise unqualified employees and contractors.

79.     Tetra Tech's conduct is ethically and morally blameworthy because Tetra Tech placed its profits ahead of the lawful interests of others and the development, including of vital and desperately needed bay area housing by failing to properly remediate the Shipyard. Tetra Tech has no reasonable excuse for these failures, which have delayed the transfer of Shipyard property and harmed Plaintiffs.

FIVE POINT AND CP DEVELOPMENT
COMPLAINT AGAINST TETRA TECH DEFS.

LEGAL02/38820662v16

80. Tetra Tech's conduct violated statutes and regulations, including at least:

- 10 C.F.R. 20.1501(a), which requires that each Nuclear Regulatory Commission licensee "shall make or cause to be made, surveys of areas, including the subsurface, that . . . are reasonable under the circumstances to evaluate the magnitude and extent of radiation levels; and concentrations or quantities of residual radioactivity; and the potential radiological hazards of the radiation levels and residual radioactivity detected."

- 10 C.F.R. 20.2103, which provides that licensees "shall maintain records showing the results of surveys" required by the regulations.

- 18 U.S.C. § 1519, which states that "[w]hoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States . . . , or in relation to or contemplation of any such matter or case, shall be fined under this title, imprisoned not more than 20 years, or both."

81. Pursuant to California Evidence Code Section 669, Tetra Tech's negligence is presumed under the doctrine of negligence per se because it violated these laws.

82. Plaintiffs' harm resulted from conduct that the foregoing statutes and regulations were designed to prevent, and Plaintiffs are within the class of persons those statutes and regulations are intended to protect.

83. The acts and omissions of Tetra Tech were conducted with malice, fraud, deceit, and/or oppression as described in this Complaint.

84. Plaintiffs have been harmed as a direct and proximate result of Tetra Tech's negligence and gross negligence.

85. As a direct and proximate result of Tetra Tech's negligence and gross negligence, Plaintiffs have suffered and will continue to suffer damages in an amount to be proven at trial.

Plaintiffs also seek punitive and exemplary damages against Tetra Tech for its deliberate malfeasance and outrageous conduct as specifically set forth above.

## VIII.   THIRD CAUSE OF ACTION
### (NEGLIGENT HIRING)

86.     Plaintiffs re-allege and incorporate by reference Paragraphs 1 through 85 above as if fully set forth herein.

87.     Tetra Tech owed a duty to Plaintiffs to exercise reasonable care in hiring employees, independent contractors, and other agents.

88.     Tetra Tech breached its duty by hiring employees, independent contractors, and other agents that were unfit and incompetent, including individuals associated with RSRS and IOEI who participated in fabricating the investigation, testing, and remediation. Tetra Tech also negligently failed to supervise those contractors and employees.

89.     Tetra Tech knew or should have known that hiring those individuals created a particular risk or hazard of fabricating the radiological data at the Shipyard. Certain employees were unskilled at detecting radiological contamination. Other employees were channeled into radiological investigation roles at the Shipyard because Tetra Tech managers had determined that they were susceptible to pressure to fabricate certain aspects of the surveys.

90.     Tetra Tech knew or should have known that those individuals were willing to or had a propensity to participate in fraudulent activities, fabricating surveys, and other aspects of the improper radiological investigation.

91.     The particular risk or hazard materialized when those employees participated in fabricating the surveys and other aspects of the radiological investigation.

92.     The unfitness and incompetence of those employees was a factor in causing Plaintiffs harm.

93.     As a direct and proximate result of Tetra Tech's negligent hiring, Plaintiffs have suffered and will continue to suffer damages in an amount to be proven at trial. Plaintiffs also seek punitive and exemplary damages against Tetra Tech for its deliberate malfeasance and outrageous conduct as specifically set forth above.

FIVE POINT AND CP DEVELOPMENT
COMPLAINT AGAINST TETRA TECH DEFS.

1

2

### IX.   FOURTH CAUSE OF ACTION
### (NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE)

3       94.     Plaintiffs re-allege and incorporate by reference Paragraphs 1 through 93

4    above as if fully set forth herein.

5       95.     Plaintiffs have existing and prospective economic relationships with

6    individuals and entities that are intended to facilitate Plaintiffs' redevelopment of the Shipyard.

7    These relationships depend upon the timely transfer of the Shipyard property to Plaintiffs

8    consistent with the schedule disclosed by the United States prior to May 2018 when significant

9    delays were revealed.

10      96.     These relationships have a reasonably probable likelihood of resulting in future

11   economic benefits or advantages to Plaintiffs.

12      97.     Tetra Tech knew or should have known of these existing and prospective

13   economic relationships. Tetra Tech knew that the Shipyard was being developed for residential

14   and other purposes and that, as master developer of certain parcels of the Shipyard, Plaintiffs

15   intended to develop the land for sale and/or investment.

16      98.     Tetra Tech owed a duty of care to Plaintiffs to avoid negligent or reckless

17   conduct that would interfere with and adversely affect the existing and prospective economic

18   relationships of Plaintiffs.

19      99.     Tetra Tech breached that duty to Plaintiffs through its misconduct at the

20   Shipyard.

21      100.    Tetra Tech knew or should have known that, if it failed to act with reasonable

22   care, the existing and prospective economic relationships Plaintiffs had with individuals and

23   entities to redevelop the Shipyard in a timely manner would be interfered with and disrupted.

24      101.    Tetra Tech was negligent and failed to act with reasonable care in connection

25   with its work at the Shipyard.

26      102.    Tetra Tech engaged in wrongful acts and/or omissions in connection with its

27   work at the Shipyard.

28

FIVE POINT AND CP DEVELOPMENT
                                                                        COMPLAINT AGAINST TETRA TECH DEFS.

103.     As a direct and proximate result of Tetra Tech's wrongful acts and/or omissions, Plaintiffs have suffered and will suffer economic harm, injury, and losses, including increased construction costs and delays in the overall development.

104.     As a direct and proximate result of Tetra Tech's negligent interference with Plaintiffs' prospective economic advantage, Plaintiffs have suffered and will continue to suffer damages in an amount to be proven at trial.

## X.     FIFTH CAUSE OF ACTION
### (INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE)

105.     Plaintiffs re-allege and incorporate by reference Paragraphs 1 through 104 above as if fully set forth herein.

106.     Plaintiffs have existing and prospective economic relationships with individuals and entities related to redevelopment of the Shipyard.

107.     These relationships have a reasonably probable likelihood of resulting in future economic benefits or advantages to Plaintiffs.

108.     Tetra Tech knew or should have known of these existing and prospective economic relationships. Tetra Tech knew that the Shipyard was being developed for residential and other purposes and that, as master developer of certain parcels of the Shipyard, Plaintiffs intended to develop residences and other projects for sale.

109.     Tetra Tech interfered with Plaintiffs' existing and prospective economic relationship by, among other things, intentionally failing to properly investigate and remediate radiological and other contamination in the Shipyard.

110.     Tetra Tech knew or should have known that its intentional wrongful acts and/or omissions were certain or substantially certain to interfere with the existing and prospective economic relationships Plaintiffs had with potential homeowners and other entities interested in redevelopment of the Shipyard.

111.     As a direct and proximate result of Tetra Tech's wrongful acts and/or omissions, Plaintiffs have suffered and will suffer economic harm, injury, and losses, including increased construction costs and delays to the overall development.

FIVE POINT AND CP DEVELOPMENT
COMPLAINT AGAINST TETRA TECH DEFS.

112.     As a direct and proximate result of Tetra Tech's intentional interference with Plaintiffs' prospective economic advantage, Plaintiffs have suffered and will continue to suffer damages in an amount to be proven at trial.  Plaintiffs also seek punitive and exemplary damages against Tetra Tech for its deliberate malfeasance and outrageous conduct as specifically set forth above.

## XI.     SIXTH CAUSE OF ACTION
### (EQUITABLE INDEMNIFICATION)

113.     Plaintiffs re-allege and incorporate by reference Paragraphs 1 through 112 above as if fully set forth herein.

114.     Due to the fraudulent conduct of Tetra Tech, Plaintiff Five Point has become a party to litigation (either individually or in combination with Emile Haddad, the Chairman and Chief Executive Officer of Five Point). These lawsuits generally allege that Plaintiff Five Point and Mr. Haddad are responsible to certain plaintiffs for injuries resulting from Tetra Tech's failure to properly investigate, test, and remediate the Shipyard pursuant to Tetra Tech's obligations to the United States. Several such cases have already been filed involving Plaintiff Five Point and Mr. Haddad, and it is possible that more such cases will be filed in the future, given the gravity of the harm perpetrated by Tetra Tech.

115.     Plaintiff Five Point has been named in multiple lawsuits based on Tetra Tech's failure to properly investigate, test, and remediate the Shipyard pursuant to Tetra Tech's obligations to the United States. To date, Five Point has been named in the following lawsuits:

- *Pennington, et al. v. Tetra Tech, Inc., et al.* (N.D. Cal., Case No. 3:18-cv-05330-JD).
- *Bayview Hunters Point Residents, et al. v. Tetra Tech EC, Inc., et al.* (N.D. Cal., Case No. 3:19-cv-01417-JD).

116.     Plaintiffs deny any liability as to any claims arising from Tetra Tech's failure to properly investigate, test, and remediate the Shipyard pursuant to Tetra Tech's obligations to the Navy. Plaintiffs are entitled to equitable indemnification and/or contribution from Tetra Tech for the costs incurred in responding to claims arising from Tetra Tech's failure to properly

FIVE POINT AND CP DEVELOPMENT
COMPLAINT AGAINST TETRA TECH DEFS.

LEGAL02/38820662v16

investigate, test, and remediate the Shipyard pursuant to Tetra Tech's obligations to the United States.

117.    In the event liability should be established in any action described above involving Plaintiffs or Mr. Haddad, which liability is expressly denied, such liability will arise by reason of the conduct and negligence of Tetra Tech. Tetra Tech is therefore bound and obligated to defend, indemnify, and hold harmless Plaintiffs and Mr. Haddad from and against any and all claims, losses, damages, attorneys' fees, judgments and settlement expenses incurred or to be incurred in response to claims arising from Tetra Tech's failure to properly investigate, test, and remediate the Shipyard pursuant to Tetra Tech's obligations to the United States.

118.    As a further direct and proximate result of Tetra Tech's improper conduct, Plaintiffs have incurred, and will continue to incur, liabilities for attorneys' fees and costs in responding to claims arising from Tetra Tech's failure to properly investigate, test, and remediate the Shipyard pursuant to Tetra Tech's obligations to the United States, in an amount to be determined according to proof at trial.

119.    In order to prevent a multiplicity of actions, a determination of the comparative fault, if any, of Plaintiffs and Tetra Tech should be made at trial of this action herein. If any party, in an action arising from Tetra Tech's failure to properly investigate, test, and remediate the Shipyard pursuant to Tetra Tech's obligations to the United States, recovers a judgment against Plaintiffs or Mr. Haddad, then Plaintiffs are entitled to be indemnified by Tetra Tech for the amount of any damages awarded in favor of that party and against Plaintiffs or Mr. Haddad, pursuant to and in accordance with the proportion of relative fault or liability attributed to Tetra Tech.

## XII.    **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs Five Point Holdings, LLC and CP Development Company, LLC pray for relief as follows**:**

A.    For compensatory and special damages pursuant to the First through Fifth Causes of Action alleged above, according to proof at trial;

FIVE POINT AND CP DEVELOPMENT
COMPLAINT AGAINST TETRA TECH DEFS.

B.   For equitable indemnification pursuant to the Sixth Cause of Action above, according to proof at trial;

C.   For punitive and exemplary damages to punish Tetra Tech for its deliberate malfeasance and outrageous conduct;

D.   For costs of suit and reasonable attorneys' fees incurred herein; and

E.   For an award holding Tetra Tech, Inc. and Tetra Tech EC, Inc. jointly and severally liable for all of the damages, costs, fees, and interest suffered by Plaintiffs arising from Tetra Tech, Inc.'s and Tetra Tech EC, Inc.'s joint tortious conduct.

F.   For interest thereon at the maximum legal rate; and

G.   For any and all other relief the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial on all triable issues.

Dated: February 27, 2020                    RESPECTFULLY SUBMITTED,

JEFFREY D. DINTZER
MATTHEW C. WICKERSHAM
ALSTON & BIRD LLP

By:      /s/ Jeffrey D. Dintzer
              Jeffrey D. Dintzer

Attorneys for Plaintiffs FIVE POINT
HOLDINGS, LLC and CP DEVELOPMENT
CO., LLC

FIVE POINT AND CP DEVELOPMENT
COMPLAINT AGAINST TETRA TECH DEFS.